## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **REGINA MCDOWELL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:08-CV-602 SNLJ** |
| | ) | |
| **DONALD BLANKENSHIP, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiffs Regina McDowell and S.F. Doe (through her next friend, Katherine Jones)

brought this lawsuit against the Phelps County sheriff, Donald Blankenship, and his deputies

Aaron Pinson, Michael Manley, and Mark Wynn.  Plaintiffs allege, among other things, that the

deputies violated Jimmy Farris's Constitutional rights when they illegally detained him after

pulling him over for running a red traffic signal, when they illegally searched him, and when they

used unnecessary force against him.  Plaintiffs allege that Sheriff Blankenship's customs and

failure to train the deputies resulted in Jimmy Farris's Constitutional deprivations.

This matter is before the Court on defendants Donald Blankenship, Aaron Pinson,

Michael Manley, and Mark Wynn's Motion for Summary Judgment (#91), filed October 31,

2011.  After an extended briefing schedule, this motion has been fully briefed and is now ripe for

disposition.

As an initial matter, the Court notes that the facts of this case are not complicated;

however, the parties' presentation of the facts to the Court has been frustrating.  The parties'

(particularly the plaintiffs') treatment of the "undisputed facts" is not in accordance with the

requirements of Local Rule 7-4.01(E).  Furthermore, the parties' memoranda only rarely cite to

the record (or to the Statements of Undisputed Facts), which required the Court to sift through several 100-page documents, over 1,000 statements of sometimes-repetitive and scantily supported facts, and over 500 poorly organized exhibits just to glean the facts of the case.  The defendants presented no factual summary in their memorandum in support, but rather recounted the facts several times from the perspective of more than five different individuals in their Statement of Uncontroverted Facts.  In addition, the plaintiffs dispute statements of fact that are clearly supported by the record.[1]

In response to the defendants' Statement of Uncontroverted Material Facts (#93), the plaintiffs filed an "Objection to Particular Facts in Defendants' Statement of Uncontroverted Material Facts" (#106).  In their Objection, the plaintiffs move for an order prohibiting the defendants from introducing certain facts into evidence or striking from the record certain paragraphs of the defendants' statement of facts for relevancy or admissibility.  The Court notes that both parties — in their combined 1,050 statements of uncontroverted material facts — have included numerous facts that are irrelevant to the determination of summary judgment in this matter (including numerous facts that neither party discusses at all in the briefing).  Rather than combing through each of the plaintiffs' objections individually, the Court has summarized the facts on which it relied for purposes of summary judgment below, and the facts are undisputed

---

[1]For example, defendants' statement of fact ¶ 64 states "Pinson asked Jimmy if he would voluntarily empty his pockets, to which Jimmy refused," and ¶ 65 states "Jimmy's demeanor changed once he was asked to voluntarily empty his pockets."  Plaintiffs deny the facts and cite to their Exhibit 35, which is the Incident Report authored by Pinson.  That report clearly states "When asked, Farris refused to empty his pockets.  It is at this point that I noticed a distinct difference in his Farris' reactions: his tone of voice changed."  It appears, then, that the plaintiffs' cited exhibit actually *supports* the defendants' two statements of fact.

except where noted.  Any issues regarding admissibility of evidence at trial will be addressed

through pretrial motions if necessary.

## I. Case Summary

At 11:16 p.m. on April 12, 2007, Jimmy Farris was driving his truck on Highway 6 in

Rolla, Missouri when he drove through a red traffic signal.  At the time, he was passing a Mobil

on the Run gas station, where Phelps County Sheriff's deputies Pinson and Manley were fueling

their patrol car.  Pinson saw Mr. Farris drive through the red light, so the two deputies finished

fueling their vehicle, started the vehicle, activated emergency lights, and pursued Mr. Farris's

truck.  After the deputies caught up with Mr. Farris's truck, Farris drove for several blocks before

turning into a Taco Bell parking lot on Highway 63.[2]

Upon pulling in behind Mr. Farris, defendant Pinson recognized the truck as being one

that belonged to someone associated with illegal drugs.  Pinson knew Mr. Farris from a prior

incident during which Mr. Farris's neighbors had complained that they suspected him of drug

activities.  Farris declined to give permission for Pinson to search his trailer for drugs at that

time.

Upon approaching Mr. Farris's truck, Pinson noticed that Farris had one hand sticking out

of the truck.  Pinson explained the reason for the traffic stop, requested and received Farris's

---

[2]There is some dispute as to how long it took for Mr. Farris to pull over. Deputy Manley testified at first that pursuit of Mr. Farris took between 5 and 10 minutes, but he testified later that pursuit took less than 5 minutes.  Manley also testified that the distance between the Mobil on the Run and the Taco Bell was less than 1 mile.  Regardless of that short distance and the confusion regarding how much time pursuit took, there is ample testimony that Mr. Farris did not immediately yield to the defendants' patrol car.  In fact, plaintiffs' own expert, Mr. Fadl, testified that he would consider Mr. Farris's behavior (as reported in the police report, which states Farris drove for several blocks before pulling over) as constituting a failure to yield to an emergency vehicle.

license and proof of insurance, and asked Farris to sit on the tailgate of his truck.  Then Pinson

contacted defendant K-9 officer Mark Wynn and requested that he come to the scene with his

drug-detecting dog, Idol.  Pinson then provided dispatch with Farris's information to investigate

Farris's driving status and warrant status.  While he waited for a response from dispatch, Pinson

began filling out the traffic ticket.

Defendant Wynn arrived soon afterwards with his dog and a ride-along civilian, Tom

Buchness, who was a military police officer.  Pinson asked Wynn to task his dog around Farris's

truck.  Wynn is a certified dog handler through the North American Police Work Dog

Association ("NAPWDA") and the Missouri Police Canine Association, and his dog, Idol, is

certified to alert to the odor of several controlled substances. When Wynn told Mr. Farris that he

was going to have his dog sniff the truck, Farris told Wynn that he could go ahead and search the

truck[3].  While Wynn's dog was sniffing the truck, Farris tried to get back into his truck from the

passenger side, but he was stopped by Buchness.  Pinson asked Farris to sit on the curb near the

Taco Bell's entrance.  The dog positively alerted to the truck's driver side door, driver's seat, and

center console.

Defendant Wynn searched the truck while Pinson ordered Farris to the truck's tailgate

and asked whether he had anything illegal in his pockets.  Pinson asked Farris if he would

voluntarily empty his pockets, but he refused.  Pinson told Wynn about Farris's refusal and

returned to his car to continue filling out the traffic ticket.  After Wynn found no drugs in Farris's

truck, Wynn told Farris that he had reason to believe Farris had drugs on his person due to the

---

[3]Plaintiffs dispute this fact (*see* #108 at ¶ 100); however, in support, plaintiffs cite to their own "Additional Uncontroverted Material Facts 167, 169, and 172," which discuss whether Farris gave Wynn consent to search his person — not his truck.  As a result, plaintiffs' dispute with whether Wynn obtained consent from Farris to search his truck is not supported.

way Idol alerted.  Wynn asked if he could search Farris's pockets, and Farris began emptying his pockets.[4]

As Farris emptied his pockets, he turned his right side away from Wynn.[5]  Wynn noticed that Farris had a pocket knife in his right pants pocket,[6] so Wynn told Farris to place his hands on tailgate so he could search him[7].   Wynn felt what he believed to be pills in Farris's pocket, at which time, the defendants contend, Farris began to struggle, and Wynn, Pinson, and Manley attempted to place Farris under arrest and in handcuffs.  The deputies told Farris to stop resisting, and the three forced Farris to the ground in an attempt to place handcuffs around Farris's wrists behind his back.  Wynn says that he warned Farris that he would spray him with pepper spray if he continued to resist, but Farris would not comply.  Wynn sprayed Farris with pepper spray, but, defendants contend, he continued to resist arrest.  Wynn warned and pepper sprayed Farris two

---

[4]Plaintiffs dispute that Farris agreed to Wynn's request that he empty his pockets.  In support, plaintiffs cite their Uncontroverted Facts 206, 211, 212, 215, 285, 289, 290, and 480. Those facts and their supporting documents go to Mr. Farris's refusal to empty his pockets at defendant Pinson's request — not defendant Wynn's request.  Three witnesses, Taco Bell employees Veronica Lee, Samantha Rall, and Brandy Gresham, each testified at their depositions that Farris did not refuse to empty his pockets when Wynn asked.  Brandy Gresham's statement to the detective at the scene is confusing, as the detective's report states that Gresham said "The deputy then told him to empty out his pockets and he said no.  Then I saw the deputies take him to the ground."  At her deposition, however, Gresham explained that Farris consented to having his pockets searched "The second time, yes.  The first sheriff [Pinson] he wouldn't let [search him] because he said he was harassing him."  As a result, plaintiffs' dispute with this fact is unsupported.

[5]Plaintiffs dispute this fact; however, the testimony they cite in support does not address whether Farris turned away from Wynn.  Their dispute is therefore unsupported.

[6]Plaintiffs dispute this fact; however, the testimony they cite in support addresses whether a knife was turned over into evidence.  Defendants do not contend that a knife was turned into evidence; rather, they state that Farris had a knife on his person, and a knife was included in an inventory of personal items found with the truck.

[7]Plaintiffs dispute this fact, but, again, the testimony they cite does not controvert the citations provided by defendants.

additional times.  Defendants state that Farris complained once that he could not breathe.

Plaintiffs deny that Farris resisted or struggled in any way, and they also contend that Farris was

hit four or five times with the spray or with continuous bursts of the spray; plaintiffs also contend

that Farris was not warned before being sprayed.  Plaintiffs also contend that Farris complained

numerous times that he was unable to breathe.

Wynn put a handcuff on Farris's left wrist while Pinson put a handcuff on Farris's right

wrist, and the two sets of handcuffs were secured together behind Farris's back with a third set of

handcuffs.  Wynn requested an ambulance as a result of Farris being pepper sprayed and because

Farris's face was bleeding.  Defendant Manley removed the pills, which were contained in a

ziploc bag and later determined to be a controlled substance known as Oxycodone, from Farris's

pocket.  Farris was rolled to his right side and vomited.   Shortly after vomiting, Farris became

unresponsive, so the handcuffs were removed, and the officers commenced life-saving efforts.

The officers were unable to resuscitate Mr. Farris.

An autopsy revealed that Mr. Farris had contusions and abrasions on his wrists, forehead,

chest, right side, left elbow, left upper arm, face, and scalp.  No brain injury was revealed, but

Mr. Farris's heart was abnormally large, weighing 500 grams, and he was posthumously

diagnosed with heart disease.  A urine screen showed 4.5 micrograms methamphetamine and

0.60 micrograms amphetamine.  The post-mortem report shows that medical examiner

determined that Mr. Farris's cause of death was an "accident" due to "hypertensive heart disease

exacerbated by methamphetamine during exertion in physical altercation."[8]  Plaintiffs dispute

that purported cause of death and contend instead that Mr. Farris died of suffocation,

---

[8]Plaintiffs dispute this fact; however, the post-mortem report clearly states the cause of death. In support of their dispute, plaintiffs cite the medical examiner's testimony that but for the altercation, Mr. Farris would not have died at that time.  That testimony does not refute the post-mortem report's finding.

"hypoxia-induced cardiac arrhythmia after aspiration of gastric contents into the airways of the lung."

Plaintiffs are Mr. Farris's mother Regina McDowell, and Mr. Farris's daughter, S.F., who is represented by her next friend, Katherine Jones. They filed this action against the deputies involved in the altercation and against the Sheriff of Phelps County, Donald Blankenship. Plaintiffs' complaint had four counts: Count I, 42 U.S.C. § 1983 Deprivation of Constitutional Rights by Deputies; Count II, 42 U.S.C. § 1983 Deprivation of Constitutional Rights by Buchness; Count III, 42 U.S.C. § 1983 Deprivation of Constitutional Rights by Sheriff Blankenship; and Count IV, Wrongful Death. Defendant Buchness was dismissed on September 16, 2008 pursuant to Federal Rule of Civil Procedure 4(d) and (m) (Doc. #19); as a result, only three counts remain.

## II. Summary Judgment Standard

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mt. Pleasant v. Associated Elec. Coop. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the

moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Nunn v. Noodles & Co.*, 674 F.3d 910, 913-14 (8th Cir. 2012). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to the discussion.

## III. Discussion

The defendants' motion seeks summary judgment on each of plaintiffs' three remaining counts.

### A.   Section 1983 Claims and Violations of Fourth and Fourteenth Amendments (Count I)

Defendants seek summary judgment on Count I, which alleges constitutional violations against the defendants for illegal detention and search, and for the use of unnecessary and excessive force under the Fourth and Fourteenth Amendments. Plaintiffs allege that each of the deputies engaged in actions that were without probable cause, were objectively unreasonable, and constituted the use of excessive force in violation of Mr. Farris's constitutional rights.

Defendants argue that they committed no constitutional violations under the circumstances existing on April 12, 2007 because they had probable cause to detain Mr. Farris

8

and both probable cause and consent to search his vehicle and person.   Further, defendants argue

that they used objectively reasonable force to take Mr. Farris into custody and to restrain him in a

prone position until they reasonably believed he was no longer resisting and no longer presented

a threat to the officers, to himself, or to others.

**1.       Vehicle Search**

The plaintiffs concede that detaining Mr. Farris for a traffic violation was lawful.

However, they maintain that the detention became unlawful when it exceeded the scope of the

initial traffic stop in three ways:  First, when defendant Pinson called defendant Wynn and his

drug-detecting dog to the scene without justification.  Second, when defendant Pinson stopped

writing the traffic ticket to confer with Wynn.  And third, when Wynn searched the truck.

Plaintiffs argue that Pinson did not develop reasonable suspicion during the proper term of the

traffic stop to justify expanding the scope of the stop, and that, as a result, Mr. Farris's Fourth

Amendment right to be free from unreasonable seizure was violated.

Defendants argue that defendant Pinson had reasonable suspicion to expand the scope of

the traffic stop, and that the vehicle search did not violate Mr. Farris's constitutional rights

because it was based on probable cause and took place with Mr. Farris's consent.  Upon catching

up with Mr. Farris's truck, defendant Pinson noticed the name "Dirtworks" on the back of the

truck's tailgate.  Based on a prior incident, Pinson associated the vehicle and its owner (Mr.

Farris) with an individual suspected of illegal drug use.   In addition, defendants argue, Mr.

Farris's behavior further raised their suspicions:   Mr. Farris had not pulled over immediately,

and his hand was sticking out of the driver's side window as Pinson and Manley approached his

truck.  Plaintiffs suggest that it was impermissible for Pinson to base his reasonable suspicion in

part on his knowledge of Mr. Farris's suspected drug association, but the Eighth Circuit has ruled

9

otherwise. *See United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004). Defendant Pinson called for defendant Wynn to come to the scene with his drug-detecting dog, Idol. Defendant Wynn and Idol arrived within ten minutes of when Pinson initially detained Mr. Farris.[9]

Defendant Wynn states that Mr. Farris told Wynn that Wynn could search the truck even before Wynn's dog sniffed the truck.[10] When the drug-detecting dog, Idol, did sniff the truck, she alerted to the truck's driver side door handle, the driver's side seat, and the center console. As a result, defendant Wynn searched the vehicle for contraband.

The Supreme Court is clear that "the use of a well-trained narcotics-detection dog...during a lawful traffic stop" does not constitute a "search subject to the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Plaintiffs suggest that Mr. Farris's otherwise lawful detention (the traffic stop) was made unlawful when it was prolonged by the call for and use of the drug-detecting dog. But it is undisputed that through the time it took for Wynn to arrive, task Idol around the vehicle, and search the vehicle, defendant Pinson was filling out the traffic summons — thus, there was no significant additional detainment of Mr. Farris as a result of the vehicle search.[11] In *Caballes*, the Supreme Court addressed "whether the Fourth Amendment

_____

[9]Defendant's memorandum states that Wynn arrived "approximately six minutes after Jimmy was initially observed running the light" (#92 at 5). But defendants also state that the "pursuit of Jimmy took between five (5) to ten (10) minutes" in their statement of undisputed facts. That fact is disputed. (*See* #108 at ¶ 147). The defendants' statement of facts also states that "Wynn arrived at the scene less than ten minutes after the initial stop of Jimmy," which is not disputed by the plaintiffs. (*Id.* at ¶ 160). As a result, the Court will proceed using the undisputed "less than ten minutes" fact.

[10]Plaintiffs dispute that Mr. Farris consented, but plaintiffs do not cite to any evidence supporting that a dispute exists. The testimony plaintiffs cite is to defendant Wynn's deposition testimony regarding whether Mr. Farris gave permission to search his *body*, not his vehicle.

[11]Plaintiffs dispute defendants' statement of fact that "As Corporal Pinson continued filling out the summons, he observed Jimmy cooperating and emptying out his pockets for Deputy Wynn," but the plaintiffs' citations addresses whether Mr. Farris consented to the search of his person, and not as whether Pinson was filling out the traffic summons at that point in time.

requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." *Id.* at 407.  The Court noted that it is "clear that a seizure that is lawful at its inception" — such as a lawful traffic stop as was the case both here and in *Caballes* — "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Id.* (citing *United States v. Jacobson*, 466 U.S. 109, 124 (1984)).  But there, the Court recognized that the duration of the traffic stop in that case had not been prolonged by the "dog sniff" — a dog sniff that resulted (as here) in the discovery of contraband and an arrest.  The Court went on to hold that a dog sniff does not infringe on an individual's constitutionally protected privacy interest and is thus not a search. *Id.*  The facts of this case are remarkably similar to the circumstances set forth in *Caballes.*  The traffic stop was not prolonged by the dog sniff (the plaintiffs make no real effort to show that it was).  And, even if the dog sniff did unconstitutionally expand the scope of the detention, Mr. Farris's *consent* to the search "purged" the illegality of the detention. *United States v. Yang*, 345 F.3d 650, 654 (8th Cir. 2003).  Although defendant Pinson stopped writing the traffic ticket when the search of the vehicle began (when the scope of the traffic stop *did* expand), there had been no "seizure" outside the scope of the traffic violation until the time that the search of the vehicle started.  As for the search of the vehicle itself, it was proper both because Mr. Farris consented and because Idol[12], the drug-detecting dog, alerted to the presence of contraband. *See United States v.*

---

(*See* #108 at ¶ 67; *see also id.* at ¶ 95 (plaintiffs admit that "As Deputy Wynn was speaking with Jimmy, Corporal Pinson was still in his patrol vehicle filling out a summons").)

[12]Plaintiffs make much of the fact that Idol's North American Police Work Dog Association certification had "lapsed" on the day of the incident.  Idol's one-year certification had expired April 7, 2007 and was not renewed until April 30, 2007.  Defendants dispute that Idol was "not properly certified," however, because the certification is typically reviewed at the level of the month and not the day due to complexities of coordinating the timing of renewal with an available trainer.  Regardless, there is no credible reason to believe that Idol is not a "well-trained narcotics-detection dog" as described in *Caballes*, 543 U.S. at 409.

*Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (holding that positive alert by a reliable drug-detecting dog is enough to establish probable cause).

### 2.    Pat Down

Plaintiffs assert that Mr. Farris's rights were violated when the defendant deputies unreasonably searched Farris's pockets. It is undisputed that Pinson first asked Farris to empty his pockets, and Farris refused. Then, after Idol alerted to the presence of drugs on the door handle and center console and seat, Wynn told Farris that he had reason to believe Farris had drugs in his pockets, and Wynn asked Farris to empty his pockets. Farris consented — either verbally or by beginning to empty his pockets. All three Taco Bell employee witnesses testified either that Farris consented verbally or that he responded to Wynn's request by beginning to empty his pockets. Thus, there is no disputed fact regarding whether Wynn obtained consent from Mr. Farris. Even without a warrant, a search is legal if the subject gives his knowing and voluntary consent. *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005). To the extent plaintiff suggests Wynn coerced Farris, there is no evidence to support that argument.

Plaintiffs also appear to assert that Wynn's protective frisk of Mr. Farris was an unreasonable search. Wynn contends he had reasonable suspicion of criminal activity, and he also had reasonable suspicion that Farris was armed. As Farris began to empty his pockets, he turned away from Wynn, and Wynn could see a knife clipped to Farris's pocket. Wynn asked Farris to turn around and put his hands on the tailgate so that he could perform a putdown.

Where an officer has a reasonable suspicion that a person is armed and dangerous, the officer may conduct a limited warrantless search. *United States v. Hanlon,* 401 F.3d 926, 929 (8th Cir. 2005). After seeing a weapon in Farris's pocket, Wynn was justified in performing a search of Farris's person for the protection of himself or others nearby in order to discover

12

weapons.  The plaintiffs contend that there was no knife in Mr. Farris's pocket to arouse any suspicion that Farris was armed.  In support, they note that no knife was entered into evidence or returned to Mr. Farris's family along with his personal effects.  A knife does appear among the items that were cataloged as having been in Mr. Farris's truck, however, which comports with Wynn's testimony that he put the knife down on the truck.  Plaintiffs do not cite to any testimony that refutes the existence of the knife.

Finally, plaintiffs claim that Wynn's location of pills in Mr. Farris's right coin pocket constituted a further unreasonable search.  However, Wynn's seizure of the pills (which actually appears to have occurred after the officers' struggle with and arrest of Farris) did not exceed the allowable scope of the pat-down search: Indeed, if an officer detects apparent contraband during a valid protective frisk, the officer may seize the item.  *United States v. Binion*, 570 F.3d 1034, 1040 (8th Cir. 2009).   Even though plaintiffs argue that the pills — which were contained in a plastic bag — would not have obviously been apparent as contraband based simply on their feel, the pills themselves were not actually seized until after Mr. Farris had been arrested and handcuffed.  *See id.* (holding that whether the contraband felt by officer created probable cause to seize them was irrelevant where nothing was seized until after subject's arrest).  Moreover, the officer had reasonable suspicion that the pills were contraband because of the way Idol had alerted: Idol alerted to the door handle, the seat, and the center console, and when the search of the car turned up nothing, it was likely that the pills in Farris's right pocket had been the contraband to which Idol alerted.

 As a result, the Court will grant summary judgment to the defendants on plaintiff's unlawful search and seizure claim related to the search of Mr. Farris's person.

### 3.     Excessive Force

At some point after Wynn removed the knife from Mr. Farris's pocket, Wynn says that he felt pills in Farris's right coin pocket and that Mr. Farris began to resist. Here, the stories of the deputies and the eyewitnesses begin to diverge. Plaintiffs contend that the defendants used excessive force to arrest Mr. Farris, and defendants argue that the force they used to subdue Mr. Farris was objectively reasonable.

"The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." *Ngo v. Storlie*, 495 F.3d 597, 604 (8th Cir. 2007). The Court analyzes excessive force claims "under a reasonableness standard to determine whether, in light of the facts and circumstances, the officer's actions were objectively reasonable." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "The objectively reasonable standard is viewed from the vantage point of the police officer at the time of arrest or seizure." *Gill*, 546 F.3d at 562 (citing *Wertish v. Krueger*, 433 F.3d 1062, 1066 (8th Cir. 2006)).

Defendants contend that the officers' use of force was reasonable because Farris initially raised his elbow in a manner that could have been perceived as aggressive. One Taco Bell employee, Veronica, testified that Farris had raised his elbow and that Farris began fighting with the deputies after being pushed into the tailgate. Veronica also testified that, while on the ground, Farris kicked at the deputies with his heels. Brandy, another Taco Bell employee,

testified that she never saw the defendants strike or hit Farris, but she did recall that they told Farris repeatedly to cooperate.  Defendants also state that Wynn used pepper spray on Farris only after Farris failed to comply with repeated commands to stop resisting.  Veronica testified that Farris went into a "full-out brawl" after being sprayed with pepper spray, which defendants say further supports the reasonableness of the force used on Farris.  As Wynn used pepper spray, defendant Manley had Farris's right arm, but Manley was unable to get the handcuffs around that hand due to Farris's resistance.  The witnesses suggest that the other deputies were holding down each of Farris's legs.  Tom Buchness, the ride-along civilian, administered nerve strikes to Farris's arm.  Manley was only able to put handcuffs on Farris's right arm after pepper spray had been used; Pinson was only able to get access to Farris's left arm (which was apparently under Farris) after pepper spray was used.  Defendants contend that although Farris did state he could not breathe, he was actively resisting and behaving as though he was having no trouble breathing. In fact, defendants assert that Farris did not stop resisting until he was finally handcuffed.

Plaintiffs contend that the eyewitness testimony supports that Farris was not resisting arrest, that he was attempting to comply with the officers' demands, and that the officers were the aggressors.  The Court finds that a genuine dispute exists here.  Although eyewitness Veronica notes that Farris struggled at first, he stopped after the officers got control of his legs, and that from that point on, "he had stopped fighting and then they were still doing what they were doing. So it wasn't necessary for them to do everything they had done."  Eyewitness Samantha testified that she never saw Farris resisting or hitting the officers.  Eyewitness Brandy testified that while the officers yelled at Farris to cooperate and put his hands behind his back, that Farris tried to tell them that he was trying to cooperate but he couldn't get his arm out from under him — the

officers were holding him down.  Meanwhile, the witnesses say, deputy Wynn was spraying

Farris in the face continuously with pepper spray.

From these facts, the Court cannot say that there is no disputed fact regarding whether the

officers used objectively reasonable force.  Although the Court must adopt the police officer's

view when determining reasonableness, *Gill*, 546 F.3d at 562, the Court must also keep in mind

the summary judgment standard, which requires the Court to review the facts in a light most

favorable to the plaintiffs and give plaintiffs the benefit of any inferences that logically can be

drawn from those facts, *Nunn*, 674 F.3d at 913-14.  Here, looking to both the testimony from

officers and the three eyewitnesses, the Court cannot say as a matter of law that the officers' use

of force was objectively reasonable, particularly in light of the dispute regarding whether or when

Mr. Farris actually resisted arrest.  As a result, summary judgment will be denied on this claim.

### 4.     Qualified Immunity

"Qualified immunity is a defense available to government officials if they have not

violated 'clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *Amrine v. Brooks*, 522 F.3d 823, 831 (8th Cir. 2008) (quoting *Young v. Selk*, 508

F.3d 868, 871 (8th Cir.2007); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It "allows

officers to make reasonable errors so that they do not always 'err on the side of caution' " for fear

of being sued. *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996) (citation omitted); *see

Davis v. Scherer*, 468 U.S. 183, 196 (1984).  "This defense provides 'ample room for mistaken

judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the

law.'" *Amrine*, 522 F.3d at 831 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

Qualified immunity determinations are based on a two-part inquiry.  First, the court

determines whether the alleged facts, viewed in the light most favorable to the injured party,

demonstrate that the official's conduct violated a constitutional right.  *Amrine*, 522 F.3d at 831; *see also Saucier v. Katz,* 533 U.S. 194, 201 (2001). Second, if the answer to that inquiry is yes, the court asks whether the constitutional right was clearly established at the time so that a reasonable officer would have understood that his conduct violated that right. *Amrine*, 522 F.3d at 831.

As already discussed, the Court is granting summary judgment to defendants on plaintiffs' claims regarding the vehicle search and pat-down.  However, Mr. Farris's right to be free from use of excessive force has been clearly established, and — as alleged — there is at least a dispute of fact as to whether or not the officers' use of force was reasonable .  As a result, qualified immunity is not warranted for the defendants on the excessive force claim.

### 5.    Substantive Due Process

Although plaintiffs claim that Mr. Farris's Fourteenth Amendment due process rights were violated on the night of April 12, 2007, as defendants point out, the basis of that claim is not entirely clear.  Defendants argue that, to prevail under a Section 1983 claim, a plaintiff must establish a violation of constitutional rights by a person or persons acting under color of state law.  42 U.S.C. § 1983.  As a result, defendants argue, the first inquiry the court must make is to identify "the specific constitutional right allegedly infringed." *Graham*, 490 U.S. at 394. The Fourteenth Amendment has been interpreted to guarantee substantive due process, which prevents the government from engaging in conduct that "shocks the conscience" or interferes with rights implicit in the concept of ordered liberty. *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).  Defendants contend that plaintiffs have not articulated what substantive due process rights plaintiffs claim were violated and that summary judgment should be granted because there

has been no allegation of constitutional deprivation beyond Mr. Farris's Fourth Amendment rights.

Plaintiffs failed to address the defendants' Fourteenth Amendment substantive due process discussion in their opposition. It appears, then, that plaintiffs have abandoned their Fourteenth Amendment claims. The defendants' reply memorandum (#120) pointed out the plaintiffs' failure to address those claims. Plaintiffs did not seek leave to file a sur-reply to address those claims. As a result, summary judgment will be granted to the defendants on the abandoned claims.

### 6.  Defendants Wynn and Manley's Authority[13]

Plaintiffs allege that Mr. Farris's constitutional rights were violated because the deputies did not have the power to arrest him. Specifically, plaintiffs contend that defendants Wynn and Manley were not authorized to arrest Mr. Farris because they did not meet the statutory definition of Deputy Sheriff under §57.015(1) RSMo. on the night of April 12, 2007. Section 57.015(1) supplies the definition for a "Deputy Sheriff" or "Officer" as the terms are used in that chapter. The definition says that, "*As used in this chapter* [57]," those terms mean

> any deputy sheriff who is employed full time by a law enforcement agency, authorized by this chapter and certified pursuant to chapter 590, RSMo. *This term shall not include an officer serving in probationary status or one year, whichever is longer, upon initial employment*. This term shall not include any deputy sheriff with the rank of lieutenant and above, or any chief deputies, under sheriffs and the command staff as defined by the sheriff's department policy and procedure manual

§57.015 RSMo. (2012) (emphasis added). Plaintiffs contend that because Wynn and Manley had not been employed by the Phelps County Sheriff's Department for a year, nor were they on probationary status, thus they did not meet the definition of "Deputy Sheriffs." That section —

---

[13]Plaintiffs address the matter of the deputies' arresting and other authority in their discussion of claims against Sheriff Blankenship for failure to supervise rather than in their Section 1983 claims.

and indeed, the chapter — does not relate to a Sheriff Deputy's right to act as a Deputy, to be

licensed as a Deputy, or to be certified as a Deputy.  Rather, it appears that the definition pertains

to an individual's right to have certain procedures followed in the event of dismissal.  Plaintiffs'

suggestion that the definition determines the power to arrest is belied by the definition's

exclusion of "any deputy sheriff with the rank of lieutenant and above, or any chief deputies."  It

defies logic that lieutenants and chief deputies would be stripped of arresting authority.

Further, §544.216 RSMo, which is cited by plaintiffs in support of their argument, sets

forth the "powers of arrest" and states that "any sheriff or deputy sheriff, ... and any county or

municipal law enforcement officer in this state...may arrest...."  To the extent plaintiffs rely on

§57.015(1) to supply the definition for "deputy sheriff" as used in § 544.216, plaintiffs are

mistaken.   The definition for "Deputy Sheriff" supplied by §57.015 does not, by its terms, apply

to §544.216 because the definitions set forth in §57.015 apply "as used in [Chapter 57]."   Thus

this Court does not agree that §57.015(1) deprived defendants Wynn and Manley of arrest power

merely because they had not been deputy sheriffs for more than one year.

### 7.    Defendant Deputies' Appointments

Plaintiffs also argue that none of the three defendant deputies was appointed properly in

accordance with Missouri statutes.  In support, plaintiffs cite § 57.250 RSMO., which states

> The sheriff in counties of the third and fourth classifications shall be entitled to
> such number of deputies and assistants, to be appointed by such official, with the
> approval of a majority of the circuit judges of the circuit court, as such judges
> shall deem necessary for the prompt and proper discharge of such sheriff's duties
> relative to the enforcement of the criminal law of this state. ...

Plaintiffs assert in their memorandum that Phelps County is a third class county and that on

December 5, 2007 (eight months after the incident), one of the two presiding circuit judges in

19

Phelps County approved the appointments of deputies Wynn, Pinson, and Manley.  However, plaintiffs assert, there is no prior order approving those deputy appointments.

Defendants do not address this argument directly.   Neither plaintiffs nor defendants include any facts about these issues in the Statements of Uncontroverted Facts filed with the briefing. Defendants contend that the plaintiffs have failed to "rebut the presumption" of §590.180(1) RSMo., which states "No arrest shall be deemed unlawful solely because of the licensure status of a peace officer, and evidence on the question cannot be received in any civil or criminal case."   The Court holds that § 590.180(1) controls here, and thus the deputies' arrest of Mr. Farris was not unlawful.

### B.      Municipal Liability of § 1983 Claims (Count III[14])

Plaintiffs' Count III is for § 1983 deprivation of constitutional rights by Sheriff Blankenship, who is being sued in his official and individual capacities.  Plaintiffs allege in their complaint that Mr. Farris died due to defendants Pinson, Manley, and Wynn's intentional acts, and that their employer, the Phelps County Sheriff's Department, failed to train or supervise them properly.

The Sheriff's Department is not a named defendant in this case; however, the defendants acknowledge that Sheriff Blankenship was the sheriff at the time of the incident, and that he was the chief policy-making authority for the Department.   In addition, a suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (citing *Elder–Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir.2006)).  Generally, a county may not be sued under § 1983 for an injury inflicted solely by its agents on a respondeat superior theory of liability.  *Id*.  However, a county may be

---

[14]Count II is against Tom Buchness.  Mr. Buchness was dismissed on September 16, 2008 (#19).

20

liable where (1) it implemented, executed, and promulgated an unconstitutional policy, (2) there existed informal approval of a "custom" so widespread as to have the force of a law that caused a constitutional deprivation under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-91 (1978), or (3) it caused a constitutional deprivation due to its "failure to adequately train" the officers, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

### 1.    Policy or Custom

Plaintiffs' complaint alleges that the Sheriff's department instituted and promulgated unconstitutional unwritten policies and customs that led to unlawful arrests, unreasonable searches and seizures, and excessive use of force, among other constitutional violations. However, where a plaintiff fails to identify any official policy that arguable played a role in the plaintiff's injuries, the unconstitutional policy claim must fail. *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1998).   To determine whether a plaintiff has presented sufficient evidence of a municipal custom, plaintiffs must demonstrate

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, *i.e.*, proof that the custom was the moving force behind the constitutional violation.

*Id.*  (changes to formatting omitted).  Here, defendants argue, plaintiffs can neither identify an official policy nor can they present sufficient evidence "from which a jury could reasonably find the existence of a relevant municipal custom" in the Sheriff's department.  *See id.*

Indeed, plaintiffs seem to have abandoned any claim related to unconstitutional policy or custom.  They do not support or even discuss either of those claims in their opposition

memorandum, much less do they identify a department policy or attempt to demonstrate the existence of a custom that contributed to plaintiffs' injuries.

## 2.      Failure to Train or Supervise

As for failure to train and supervise, a government entity "is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *Canton v. Harris*, 489 U.S. 378, 387 (1989).  Claims based on a supervisor's failure to supervise or otherwise control subordinates may only be maintained if the defendant "demonstrated deliberate indifference or tacit authorization of the offensive acts." *Bolin v. Black*, 875 F.2d 1343, 1347 (8th Cir. 1989) (quoting *Wilson v. City of North Little Rock*, 801 F.2d 316, 322 (8th Cir. 1986)); *see also Andrew v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996).  An official exhibits deliberate indifference only if he or she actually knows of a substantial risk and fails to respond to it reasonably. *See Farmer v. Brennan*, 511, U.S. 825, 844-45 (1994).  Thus, to prove their case, the plaintiffs must show that officials of the Sheriff's department had notice of prior incidents of police misconduct and deliberately failed to act on that knowledge.  *Harris v. Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987).

Rather than addressing these matters, however, plaintiffs' argument is limited to whether or not the defendant deputies had arrest power on the date of the incident.  Plaintiffs state that "Sheriff Blankenship failed to properly supervise the officers under his authority" in that he "gave Wynn and Manley patrol cars, guns, and the apparent authority to effectuate arrests" and that he appointed Wynn, Manley, and Pinson without obtaining court orders as required by statute.  This Court has already addressed and overruled those arguments.  Plaintiffs make no effort to show that the defendant deputies' training was lacking to rebut defendants' showing that each deputy was trained appropriately.  Nor do plaintiffs suggest that the department knew of

prior offensive acts by its deputies and deliberately failed to act on that knowledge.  Plaintiffs have therefore not set forth sufficient facts to show that a jury could return a verdict in their favor on this Count.

As a result, summary judgment will be granted to Sheriff Blankenship on plaintiffs' §1983 claims.

### C.    State Law Tort Claims (Count IV)

Plaintiffs' Count IV is a claim for Wrongful Death under § 537.080(1) RSMO.  Plaintiffs appear to bring that claim against the Sheriff and deputy defendants.

Defendants contend that they are entitled to official immunity on plaintiffs' wrongful death claim.  Under that doctrine, public employees are protected "from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts."  *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008). Official immunity does not apply to torts committed by an official while "acting in a ministerial capacity."  *Id.*  Defendants argue that the deputies' acts were discretionary because their acts — restraining an individual and placing him under arrest — "requires the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued."  *Id.*

Plaintiffs did not respond at all to defendants' arguments regarding plaintiffs' wrongful death claim, and they do not contest that official immunity exists for the defendants under the circumstances.  Defendants have met their burden of demonstrating that the undisputed facts support their argument for summary judgment, and the plaintiffs have not made any showing in rebuttal.  Plaintiffs have thus conceded and abandoned their wrongful death claim.  As a result, the Court grants summary judgment to defendants on plaintiffs' state law claim.

**IV. Conclusion**

Summary judgment will be granted in part and denied in part.  A separate order will

issue.  Remaining for trial in this matter is plaintiffs' excessive force claim under Count I.

Dated this  30th  day of July, 2012.


UNITED STATES DISTRICT JUDGE